[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-12767
_____

D.C. Docket No. 1:11-cr-00012-KD-N-7

UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

CHRIS VERNON,

Defendant-Appellee.

_____

No. 12-13266
_____

D.C. Docket No. 1:11-cr-00012-KD-N-3

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BUTCH BRILL,

                                                              Defendant-Appellant.

_____

No. 12-13311
_____

D.C. Docket No. 1:11-cr-00012-KD-N-8

UNITED STATES OF AMERICA,

                                                              Plaintiff-Appellee,

versus

JEFF VERNON,

                                                              Defendant-Appellant.

_____

Appeals from the United States District Court
for the Southern District of Alabama
_____

(July 26, 2013)

Before HULL and PRYOR, Circuit Judges, and SCHLESINGER,[*] District Judge.

_____

[*]Honorable Harvey E. Schlesinger, United States District Judge for the Middle District of
Florida, sitting by designation.

2

HULL, Circuit Judge:

These three consolidated appeals arise from a single prosecution involving health care fraud and violations of the Anti-Kickback laws regulating Alabama Medicaid, which is funded in part by the United States government.  Defendant Jeff Vernon appeals his convictions on numerous grounds, including the district court's denial of his motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29.  Defendant Butch Brill also appeals the district court's denial of his Rule 29 motion.  The government appeals the district court's order setting aside the jury's guilty verdicts as to Chris Vernon and granting his Rule 29 motion.

This prosecution involves "factor" medication, which is a special, expensive medication used to treat hemophilia, a blood clotting disease.  Defendants Chris Vernon and Jeff Vernon were executives of MedfusionRx, LLC ("Medfusion"), which is a specialty pharmacy that fills prescriptions for factor medication.  Their dispensing factor medication, especially to Medicaid recipients, was a profitable, and indeed, lucrative business due to the high Medicaid reimbursement rate.  In order to gain more factor medication business, Medfusion made sizable payments to individuals and businesses if they would refer their hemophiliac clients to Medfusion for prescription filling.  Specifically, Medfusion paid 45 to 50 percent of its profits on filling factor medication prescriptions to the individual or business

3

that referred that client to Medfusion for prescription filling. Those kickback payments for referrals form the basis of the charges against Chris Vernon and Jeff Vernon.

Meanwhile, Butch Brill worked for a business that received those kickback payments. Butch Brill was convicted of conspiring with others, including his estranged wife Lori Brill, to increase the kickback payments he received by committing health care fraud. Specifically, the conspirators falsified records in order to justify the ordering of more factor medication than was necessary.

After review of the extensive trial record and with the benefit of oral argument, we affirm the convictions of Jeff Vernon and Butch Brill. As to Chris Vernon, we vacate the district court's Rule 29 acquittal of him on counts ten, eleven, and twelve, we reverse the alternative award of a new trial, and remand for reinstatement of the jury's guilty verdicts and sentencing on those counts.

## I.  PROCEDURAL HISTORY

### A.    Second Superseding Indictment

A federal grand jury in the Southern District of Alabama returned a second superseding indictment ("indictment") against eight defendants: Butch Brill, Chris Vernon, Jeff Vernon, Lori Brill, Travis Goodwin, Tony Goins, Eric Mosley, and Leroy Waters.

4

Two defendants, Travis Goodwin and Leroy Waters, pled guilty and testified at trial.  Six defendants went to trial.  This appeal concerns the convictions of three defendants: Butch Brill, Chris Vernon, and Jeff Vernon.

Count one of the indictment charged defendants Butch Brill, Lori Brill, and Travis Goodwin with conspiracy to falsify factor medication records, in violation of the health care fraud statutes, 18 U.S.C. §§ 1347(a), 1349.  Counts two and three charged them with substantive counts of health care fraud, in violation of 18 U.S.C. § 1347 and aiding and abetting health care fraud, in violation of 18 U.S.C. §§ 2, 1347.

Count nine charged defendants Chris Vernon, Jeff Vernon, and Lori Brill with conspiracy to pay money to Lori Brill to induce her to refer Medicaid clients to the Vernons' company, Medfusion, and to increase Medfusion's profits, in violation of the Anti-Kickback statute, 42 U.S.C. § 1320a-7b(b); 18 U.S.C. § 371. Counts ten, eleven, and twelve charged them with substantive violations of the Anti-Kickback statute, 42 U.S.C. § 1320a-7b(b).

Count fourteen charged defendants Chris Vernon, Jeff Vernon, and Leroy Waters with conspiracy to pay money to Leroy Waters to induce him to refer Medicaid clients to Medfusion and to increase Medfusion's profits, in violation of the Anti-Kickback statute, 42 U.S.C. § 1320a-7b(b); 18 U.S.C. § 371.  Counts

fifteen, sixteen, and seventeen charged them with substantive violations of the Anti-Kickback statute.[1]

## B.    Rule 29 Motions

The joint jury trial of the six defendants began on January 30, 2012.  After the government rested its case, the defendant-appellants here—Butch Brill, Chris Vernon, and Jeff Vernon—each moved for a judgment of acquittal under Rule 29(a).

The district court: (1) denied Butch Brill's Rule 29(a) motion as to counts one and three and took it under advisement as to count two; (2) granted Chris Vernon's Rule 29(a) motion as to counts fourteen through seventeen and reserved ruling as to the other counts; and (3) reserved ruling on Jeff Vernon's Rule 29(a) motion.

On February 8, 2012, Butch Brill and Jeff Vernon each called one witness and rested.  Chris Vernon did not present evidence.  At the close of the evidence, all three defendants renewed their Rule 29(a) motions for acquittal, which the district court took under advisement.

## C.     Jury Verdict

---

[1]Counts thirteen and eighteen charged defendants Chris Vernon and Jeff Vernon with additional substantive violations of the Anti-Kickback statute.  Before trial, the district court granted the government's motion to voluntarily dismiss these counts.

On February 13, 2012, the jury found defendant Butch Brill: (1) guilty of count one, the health care fraud conspiracy; and (2) not guilty of counts two and three, the substantive health care fraud violations.

The jury found defendants Chris Vernon and Jeff Vernon: (1) not guilty of count nine, the conspiracy to make unlawful referral payments to HMS/Lori Brill; and (2) guilty of counts ten, eleven, and twelve, the substantive Anti-Kickback statute violations involving referral payments to co-defendant Lori Brill. [2]

The jury also found defendant Jeff Vernon: (1) guilty of count fourteen, the conspiracy to make unlawful referral payments to Waters; and (2) guilty of counts fifteen, sixteen, and seventeen, the substantive Anti-Kickback statute violations involving referral payments to co-defendant Waters.

After the verdict, the district court denied all pending Rule 29(a) motions.

**D.    Post-Trial Motions**

Post-trial, each defendant filed a Rule 29(c) motion for acquittal. Chris Vernon and Jeff Vernon also filed Rule 33 motions for a new trial.

---

[2]Although co-defendant Lori Brill did not appeal here, we note the verdict as to her because we later on discuss her interaction with the three defendants in this appeal. The jury's verdict as to Lori Brill was similar: (1) guilty of the conspiracy offense in count one; (2) not guilty of the substantive health care fraud violations in count two; (3) guilty of the substantive fraud violation in count three; (4) not guilty of the conspiracy offenses in counts four and nine; and (4) guilty of the substantive violations of the Anti-Kickback statute in counts ten, eleven, and twelve.

After a hearing, the district court granted Chris Vernon's Rule 29 motion for a judgment of acquittal on counts ten, eleven, and twelve, which were his only convictions. Alternatively, the district court granted Chris Vernon's motion for a new trial on those counts. The district court denied Jeff Vernon's and Butch Brill's post-trial motions.

## E.    Sentences

The district court sentenced Butch Brill to fifteen months' imprisonment, followed by three years' supervised release, with no fine. A few days later, the district court sentenced Jeff Vernon to three years' probation, with a $1,750,000 fine due immediately. The district court required that Jeff Vernon serve 180 days of his sentence at a residential re-entry center, which he has since completed.

Although Butch Brill and Jeff Vernon appeal their convictions, they do not challenge their sentences. The government, however, appeals the district court's Rule 29 acquittal of Chris Vernon on counts ten, eleven, and twelve.

Because all three appeals involve Rule 29 motions and the sufficiency of the evidence, we recount in detail the evidence at trial. And given that the evidence regarding Chris Vernon and Jeff Vernon is closely intertwined, we first discuss the evidence about their making kickback payments to co-defendants Lori Brill and Leroy Waters for referrals of factor medication clients and then the merits of their

8

two appeals.  Afterwards, we outline the evidence regarding Butch Brill and discuss his appeal.

## II.  TRIAL EVIDENCE

### A.    Medfusion Rx, LLC

Throughout all events in this case, Medfusion was a specialty pharmacy based in Birmingham, Alabama.  Specialty pharmacies dispense critical, rare, and expensive medications, and they also provide certain health care services to their clients, including infusion and educational services.  As a specialty pharmacy, Medfusion filled prescriptions for medications used to treat long-term, serious diseases, including hemophilia.

Medfusion was a successful business.  It is undisputed that between 2005 and 2010, Medfusion grew from $12 million in sales to over $200 million. Medfusion supplied drugs in 45 states and had physical locations in 4 states.

Defendants Jeff Vernon and Chris Vernon were both officers of Medfusion, and at least Jeff Vernon was a co-owner.  Specifically, by 2008 and during 2009 (the time period covered by the indictment), Jeff Vernon was Medfusion's chief executive officer ("CEO") and Chris Vernon was its chief financial officer ("CFO").  Jeff had worked for Medfusion since around 2005, and Chris had worked there since 2006.

Although Jeff Vernon's wife, Suzanne, established Medfusion, she by 2007 had stopped working there. By 2008, she had transferred part of her interest in Medfusion to Jeff Vernon.

Before addressing the kickback payments here, we describe how Medfusion dispensed and was paid for factor medication for Alabama Medicaid recipients.

## B.    Medicaid Reimbursements for Factor Medication

Alabama Medicaid is a state-administered program that provides health care services for residents of Alabama who are either members of a low-income family or are disabled adults. The program receives federal funding through the Centers for Medicare and Medicaid Services.

Alabama Medicaid requires that a company or individual, including a physician or a pharmacy, become a "provider" before it furnishes a Medicaid recipient with health care services. To become a provider, a pharmacy like Medfusion must complete an application and execute a provider agreement. In the provider agreement, the specialty pharmacy must agree to comply with all federal policies.

Persons who suffer from hemophilia—a disease that interferes with the blood's clotting ability—need and receive factor medication, a blood-clotting drug administered via intravenous injections. Hemophiliacs generally inject one

10

prophylactic dose of factor medication twice per week, and sometimes take supplemental injections as needed.

Beginning on January 1, 2008, Alabama Medicaid required providers of hemophilia services to Alabama Medicaid recipients to sign a document, entitled "Hemophilia Management Standards of Care." This document listed various services that a health care provider must provide to a hemophiliac patient, including, inter alia: (1) home or office delivery of factor medication; (2) educational materials and programs; (3) medically necessary ancillary supplies; (4) constant emergency telephone support; (5) access to clinical staff trained in hemophilia treatment; (6) emergency delivery of factor medication within 24 hours of a prescription; (7) monthly phone calls by a patient "case representative," assessing the patient's state of well-being, incidence of adverse events, home inventory of factor medication, and confirmation of next medication delivery date; (8) tracking of the amount of factor medication a patient had on hand and was using; and (9) an annual in-home assessment by a nurse or pharmacist trained in hemophilia treatment.

On Medfusion's behalf, Jeff Vernon signed a copy of these Standards of Care on December 19, 2007. Thus, Medfusion, as a specialty pharmacy, agreed to provide these services to the hemophiliac patients who filled their factor medication prescriptions with Medfusion.

11

Under Alabama Medicaid policy, factor medication prescriptions are usually written for one-month allotments, and a patient usually files Medicaid claims for factor medication prescriptions twelve times per year. These prescriptions include both prophylactic doses and "as-needed" doses for emergencies. Although hemophiliac patients need monthly prescriptions to obtain factor medication, a patient may not actually need or use the maximum monthly allowable dosage.

Each monthly shipment of factor medication may vary depending on a patient's needs, which are reported in a "factor infusion log" that the patient's pharmacy is required by Alabama Medicaid to maintain. In these logs, a hemophiliac patient records each time he or she receives an infusion of factor medication and the number of units received during the infusion. Alabama Medicaid requires specialty pharmacies like Medfusion to provide these logs for their patients in order to discourage patients from stockpiling medication.

Factor medication is expensive. It was not uncommon for factor medication to cost between $50,000 and $200,000 per patient, per month. In 2010, Alabama Medicaid spent $23 million paying for factor medication for 90 patients. Alabama Medicaid reimburses providers, like Medfusion, for recipients' prescribed medications.

In 2008, Alabama Medicaid implemented a new formula for paying specialty pharmacies like Medfusion for factor medication. Under this new

12

formula, Alabama Medicaid reimburses a specialty pharmacy the average sales price, plus six percent, for a factor medication prescription. For each unit of factor medication dispensed, Alabama Medicaid also paid the pharmacy a "furnishing fee" which, between 2008 and 2010, rose from 15 to 18 cents. A single dose of factor medication might consist of approximately 3,000 units. Thus, in 2008, a specialty pharmacy received a furnishing fee of $450 for filling a prescription for just one dose of factor medication, and in 2010, the specialty pharmacy received $540 for one dose of factor medication. The furnishing fee was meant to cover the patient services provided by specialty pharmacies. Additionally, each time a specialty pharmacy filled a factor medication prescription, Alabama Medicaid also paid that pharmacy a "dispensing fee," which covered various administrative costs.

Often patients obtain prescriptions for far more factor medication than they actually need, resulting in profits for specialty pharmacies that are sometimes wrongfully shared with patients. A Food and Drug Administration ("FDA") investigator testified that Lori Brill informed him that it "was common knowledge within the hemophilia community that if a hemophiliac patient wanted to obtain more factor medication than he or she actually needed, [he or she] could often be successful in doing that." Lori Brill also told the investigator that, often, inexperienced physicians could be persuaded to prescribe more factor medication than a patient actually needed.

13

At trial, the evidence suggested that factor medication prescriptions are susceptible to health care fraud because factor medication is so expensive and because publicly funded health care programs like Alabama Medicaid reimburse pharmacies for filling factor medication prescriptions at very high rates.

Here, given the high reimbursement rates, Medfusion paid large sums to individuals simply for referring hemophiliac patients to Medfusion for filling their prescriptions. Medfusion recruited co-defendants Lori Brill (through her company Hemophilia Management Specialties ("HMS")) and Leroy Waters to refer their clients to Medfusion for prescription filling. In turn, HMS/Lori Brill and Waters received 45 percent and 50 percent respectively of any profits Medfusion earned from the referred clients. We detail further the trial evidence about Medfusion's relationships with HMS/Lori Brill and then Waters and the sizable referral fees Medfusion paid them.

## C.    Lori Brill's/HMS's Referrals to Medfusion

Lori Brill is a hemophilia carrier and has a son, David Skowronski, who is a hemophiliac. Beginning in 2004, Lori Brill worked as an employee of a health care services company, ECM Home Health Service, Inc. ("ECM"). At ECM, Lori Brill worked as a "patient advocate" for hemophiliac patients.[3] She attended medical appointments with her clients, helped them with routine life tasks, and

---

[3]Witnesses also used the term "patient manager" to refer to the same position.

14

assisted them in filling prescriptions.  Lori Brill also actively recruited new patients for ECM.

By November 2007, Lori Brill had left ECM and formed and incorporated her own company, Hemophilia Management Specialties ("HMS").

By this time, Lori Brill had also developed a relationship with Medfusion. Lori Brill began to refer her existing clients to Medfusion for the filling of their factor medication prescriptions.  Lori Brill admitted that, by September 2009, six HMS clients had used Medfusion to fill factor medication prescriptions.  To retain control over where her clients filled their factor medication prescriptions, Lori Brill continued to provide various services to her clients, serving as their patient advocate.

For example, one of HMS's former clients, Ashley Sprinkle, testified that Lori Brill: (1) took Sprinkle to appointments with doctors; (2) spoke to doctors on Sprinkle's behalf; (3) took Sprinkle shopping for clothes and purchased the clothes; (4) received Sprinkle's factor medication prescriptions from doctors and ensured that the prescriptions were filled; and (5) called Sprinkle to make sure that she had an adequate supply of factor medication on hand.  Lori Brill first began performing these services for Sprinkle sometime around 2003 and was still doing so during 2007 and 2008.

15

Likewise, Travis Goodwin, another HMS client, testified that Lori Brill helped him "get to see doctors, get appointments with doctors, make sure [he] got [his] medicine, [and] make sure the doctor was treating [him] right." Lori Brill became Goodwin's patient advocate in 2004. Goodwin, who pleaded guilty to health care fraud before trial, testified that Lori Brill would sometimes order more factor medication than needed and that some of his factor medication expired before he could use it.

Additionally, Sherry Demouey, the mother of a hemophiliac, Cameron Demouey, testified that Lori Brill contacted her and provided her with information about hemophilia days after her son, Cameron, was born with the disease in 2002. From that time forward, Lori Brill was Cameron Demouey's "hemophilia coordinator." Lori Brill accompanied Sherry and Cameron Demouey to Cameron's medical appointments. Demouey stated that "when the doctor would write the prescriptions, [Demouey] would go ahead and give them to [Lori Brill] . . . and [Lori Brill] would take them from there . . . to the pharmacist, and then have the medicine filled."

An Alabama Medicaid clinical pharmacist testified that Alabama Medicaid's Standards of Care did not require that a specialty pharmacy arrange for someone to attend doctors' appointments with a hemophiliac patient and personally arrange for the filling of prescriptions. The pharmacist stated that it was not "normal" for a

pharmacy representative to attend a doctors' appointment with a patient.  Thus, when Lori Brill attended doctors' appointments with her clients, and arranged for their prescriptions to be filled, she acted on her own behalf or for HMS.  The only work that she did for Medfusion was referring her existing clients for prescription filling.

Medfusion paid HMS/Lori Brill a commission of 45 percent of the profits that it earned from filling factor medication prescriptions for clients she referred to Medfusion.  Lori Brill/HMS did not charge their clients for any service, including taking them to doctors' visits.  Rather Lori Brill/HMS made money out of kickback payments from Medfusion after Medfusion filled an HMS-referred client's prescription.

Lori Brill sometimes even passed a share of these kickback payments on to her clients, either by giving them jobs at HMS or a thrift store that she owned, or by paying for them to go on shopping trips or social outings.  For example, Demouey testified that Lori Brill gave her jobs at HMS and at the thrift store, and occasionally took her on shopping trips.  Demouey also testified that she routinely filled her son's factor medication prescriptions through Medfusion, until she became dissatisfied with Medfusion's method of delivering the medication.  Demouey, who pled guilty to health care fraud before trial, testified that Lori Brill directed her to falsify the tracking logs for several HMS clients.

17

Likewise, Sara Spencer, the mother of two young hemophiliac boys who were both HMS clients, stated that Lori Brill paid her $1,500 per month to be HMS's "marketing coordinator" from June 2007 until sometime in 2008. According to Spencer, she worked approximately 20 hours per week and her duties were limited to updating HMS's website, searching the internet for news articles about hemophilia, drafting newsletters, and making business cards. During some of this period, from November 2007 until November 2008, Spencer filled at least one of her sons' factor medication prescriptions through Medfusion.[4]

As noted earlier, Alabama Medicaid required that specialty pharmacies like Medfusion provide various health care services to patients whose prescriptions Alabama Medicaid covered. Medfusion did not provide these services.

For example, Sprinkle and Goodwin both testified that they did not receive "home visits" from nurses while they were HMS clients. Similarly, Sprinkle stated that, after she started filling her sons' factor medication prescriptions through Medfusion: (1) no Medfusion employee called to check on her medication inventory; (2) Medfusion did not send a nurse to her home; (3) Medfusion did not train her "with regard to appropriate medication use, realistic therapy expectations, and positive outcomes related to therapeutic adherence"; (4) no Medfusion

_____

[4]HMS/Lori Brill also used other specialty pharmacies besides Medfusion, but we focus only on HMS/Lori Brill's interaction with Medfusion, owned and operated by defendants Chris Vernon and Jeff Vernon.

employee ever informed her of educational resources available to her or offered her educational materials; and (5) Medfusion did not inform her of the availability of constant emergency clinical care.

In July 2009, Medfusion's corporate compliance officer, Stacy Walton, sent an email to Chris Vernon, with Jeff Vernon carbon copied, expressing her concerns that Goodwin had not received a home visit or educational training, despite the fact that he had "been consistently getting shipments" of factor medication. Walton also expressed concern that Sprinkle might not receive a home visit or "teaching" when she was due for both in the following month.

Thus, the relationship between HMS/Lori Brill and Medfusion was based on Lori Brill referring her Medicaid clients to Medfusion and in turn Medfusion paying her kickbacks for doing so. This referral arrangement was lucrative for both parties. For example, between 2007 and 2009, Medfusion received from Alabama Medicaid: (1) approximately $1.3 million for filling prescriptions for Goodwin; (2) over $1 million for filling prescriptions for Skowronski, Lori Brill's son; (3) approximately $125,000 for filling prescriptions for Cameron Demouey; and (4) approximately $215,000 for filling prescriptions for Sprinkle. In just one year, between September 2007 and October 2008, Medfusion earned a net profit of $451,988.61 from filling factor medication prescriptions for Lori Brill's clients alone and paid her 45 percent or $203,394 of that sizable yearly profit.

The record further showed that in the 22-month period between November 2007 and August 2009, Medfusion paid a total of $369,371 to HMS, consisting of: (1) $50,000 in 2007; (2) $195,203 in 2008; and (3) $124,168 in 2009. The Vernons fully knew that Medfusion was making sizable payments to Lori Brill/HMS, and Lori Brill/HMS was not performing any work or services for Medfusion other than referring clients for prescription filling.

**D.    HMS/Lori Brill's Proposed Contract with Medfusion**

Because they well knew about Medfusion's hefty payments to Lori Brill/HMS, the Vernons' main defense at trial was that they thought Medfusion's payments to Lori Brill were lawful, and thus the government failed to prove any willful crime. Although Lori Brill referred clients to Medfusion without any written contract about her payments, the Vernons stress that their lawyer did draft a proposed contract for HMS/Lori Brill. We discuss that contract briefly even though Lori Brill never signed it.

In February 2008, Jeff Vernon had Medfusion's attorney, Steven Benefield, draft a contract between Medfusion and HMS. Benefield assisted in the formation of Medfusion and routinely provided legal assistance to Medfusion, Jeff Vernon, and Chris Vernon between 2003 and 2008. Benefield was Jeff Vernon's "primary lawyer and sort of his general counsel."

20

On April 14, 2008, Benefield sent the final draft version of that contract to Jeff Vernon and Chris Vernon via email.  The draft contract required that HMS/Lori Brill perform specific marketing and compliance tasks, other than simply referring her existing clients to Medfusion.  It provided that HMS would receive a commission of at least 45 percent, and not greater than 50 percent, of Medfusion's gross profits for prescriptions filled for HMS-referred clients.

Attorney Benefield testified that he believed that the draft contract was lawful, stating: (1) "I have not made a communication that it's unlawful because I happen to believe it's lawful.  I did then; I still do"; and (2) "Had I concluded that it was not lawful, I would have never sent it out."  As discussed later, what Benefield did not know was that HMS/Lori Brill was not, and never was, actually performing the marketing and compliance tasks in the proposed contract.  What Benefield did not know was that Lori Brill was only referring her clients and was being paid simply for referrals.

In any event, Lori Brill did not sign the draft contract on HMS's behalf.  In her FBI interview, Lori Brill claimed that she did not sign the contract because it "called for all of her patients to fill their prescriptions at Medfusion, but she wanted her patients to be able to fill their prescriptions wherever they wanted to." In other words, if her clients insisted on changing pharmacies, she wanted to be

21

free to negotiate and receive referral fees from those pharmacies, and not be bound to Medfusion.

Notably, the relationship between Medfusion and HMS/Lori Brill did not change after Lori Brill declined to sign the contract. In an August 27, 2008, email, Jeff Vernon advised Benefield: "Lori has never signed the contract you prepared. Which, I am really not that concerned about."

While Medfusion's referral payments to co-defendant Lori Brill formed the basis of counts ten, eleven, and twelve against the Vernons jointly, we now discuss Medfusion's payments to co-defendant Leroy Waters, which were the basis of counts fifteen, sixteen, and seventeen against Jeff Vernon.

## E.    Leroy Waters's Employment with Medfusion

Leroy Waters was a hemophiliac himself and had several family members who were hemophiliacs. Waters was originally a patient of ECM's. He later became an ECM employee working in sales. During this time period and before 2006, Lori Brill was a co-worker of Waters's at ECM.

Candi Marks Williams, who was also Waters's co-coworker at ECM, testified that, as a sales representative, Waters

> would mostly manage his family which [were] his patients. It was supposed to be recruitment, making sure that everything was okay, taking them to the doctor if needed, picking them up, calling them on a regular basis, making sure they had enough factor in case something happened, dinners, lunches.

22

Waters later became responsible for providing services for most of ECM's African American clients. Most of Waters's clients were insured by Alabama Medicaid.

In July 2006, Lori Brill contacted Jeff Vernon and informed him that she was not happy working at ECM. Lori Brill stated that she wanted to meet with Jeff Vernon and Waters to talk "about some other options." Jeff Vernon responded by arranging a meeting with Lori Brill and Waters. At the scheduled meeting, Lori Brill did not appear and Jeff Vernon met only with Waters.

At that meeting, Waters proposed that Medfusion hire him and Lori Brill. After the meeting, Waters and Williams sent Jeff Vernon a document containing a list of the initials of Waters's Medicaid-recipient clients and the amounts of factor medication that each normally needed. In other words, if Medfusion hired and paid Waters, he would refer his clients to Medfusion for prescription filling.

About ten days after Jeff Vernon's first meeting with Waters, Jeff Vernon met with Waters, Williams, and Chestang. One account of the meeting came from Jeff Vernon's deposition testimony in an unrelated 2007 civil case that the government introduced at trial. Jeff Vernon testified that, although Waters, Williams, and Chestang told him what their salaries were at ECM, they "did not discuss any compensation package" at Medfusion. Jeff Vernon also stated that the meeting was only between himself and the three ECM employees, and that, when Medfusion decided to hire Waters, Williams, and Chestang, Chris Vernon had no

23

role "in computing any of the compensation packages for the ECM employees that were coming onboard."

Williams confirmed her attendance at the meeting, but testified that Chris Vernon attended the meeting too, although Waters and Jeff Vernon "did most of the talking." Williams also stated that, during the meeting, Jeff Vernon proposed that Medfusion pay Waters, Williams, and Chestang "bonuses probably every three months."

After this second meeting, Medfusion hired Waters, Williams, and Chestang. The hires quickly turned out to be profitable for Medfusion. Waters brought most of his ECM clients with him to Medfusion. Waters also began filling his own factor medication prescriptions through Medfusion. As a result, Medfusion's number of factor medication clients roughly doubled.

Medfusion initially paid Waters a salary of approximately $100,000, plus a portion of the profits Medfusion earned from filling prescriptions for his clients. Although Medfusion began paying Waters in 2006, it was not until March 10, 2008, that he signed a written "Employment Agreement" with Medfusion to work as a "hemophilia sales associate." This contract provided that Waters agreed that his position would be "full-time employment" and that he would "devote his . . . best efforts and all of his . . . business time, attention and skills to the successful

continuation of the business of [Medfusion]." Waters's contract also stated that he would receive "an annualized salary of 50% of net profit[s] from his sales."

On June 30, 2008, Waters and Medfusion entered into a revised employment agreement drafted by Medfusion's attorney, Benefield. According to Benefield, Jeff Vernon wanted Waters, who "was a salaried and commissioned sales employee," to become "a salaried employee with bonus, but which would effectively cap his commission." In the revised contract, Waters again agreed "to devote [his] full professional and business time, attention, and efforts to the business and affairs of [Medfusion] during the Term of [Waters's] employment."

The revised contract did provide a new method for paying Waters. It entitled Waters to receive "an annualized salary of $92,000" and "a commission for the past and future value of the sales to customers of Medfusion by [Waters] equal to . . . a net payment of $289,500."

Regardless of the precise contract terms, Medfusion paid Waters: (1) approximately $400,000 in 2007; (2) approximately $700,000 in 2008, which included a $200,000 loan from Medfusion to purchase a home; and (3) approximately $325,000 in 2009. Waters also received various fringe benefits from Medfusion. For example, Waters received a company vehicle, which he used as his primary personal vehicle. Medfusion gave Waters a company credit card

25

that Waters used for personal expenses, including charges at Wal-Mart, Alabama Power, Blockbuster Video, Red Lobster, and casinos.

The evidence established, however, that Waters did not actually "devote" his "best efforts" or "all of his business time" to working for Medfusion; nor did Medfusion actually expect him to do so. Rather, in exchange for large payments, Waters ensured that his hemophiliac clients, with whom he already had existing relationships, filled their factor medication prescriptions through Medfusion. Waters also did not recruit new clients to Medfusion, as his contract required. Basically, Waters brought himself and his hemophiliac clients with him from another pharmacy to Medfusion.

Williams, Waters's former co-worker at ECM and at Medfusion, testified to this end. Williams stated that Waters's supposed "main duties" at Medfusion were "[s]ales, recruitment, talking to the patients, lunches, dinners, taking care of any problems that arise with them, doctors' visits, things like that." However, when asked what Waters "really [did]," Williams stated: "Well, he went out of town a lot to see his family and he would do lunches and dinners and he was mainly at the casinos or the dog track . . . . [g]ambling . . . . [a]ny day of the week."

Williams also testified that Waters encouraged his clients to order more factor medication than they needed. For example, she testified that one of Waters's clients had a "pantry . . . full" of factor medication. When Williams's son

26

needed more factor medication, Waters shared with Williams some of the excess factor medication dispensed to the client with the "pantry . . . full." As another example, Waters told Williams to call a client (Kyle) and tell him that he needed to order more factor medication even though that client indicated he did not need it.

Like Lori Brill, Waters also passed some of his kickback earnings on to his clients. Waters frequently paid his clients' rent, phone bills, and power bills. Williams testified that Waters said to her after making these payments, "'Well, I told [a client] she better not tell nobody, because I'll get in trouble.'"

We recognize that Medfusion's contracts with Waters identified him as an "employee," its organizational chart listed him as a "sales representative," and Medfusion issued a W-2 tax form for Waters for each year from 2006 to 2009. In reports to the State of Alabama, Medfusion listed Waters as an employee beginning in the fourth quarter of 2006 and ending in the fourth quarter of 2009.

However, the greater weight of the evidence showed that the purported "employee" relationship between Waters and Medfusion was a sham. For example, Waters worked from his home in Mobile, rarely, if ever, visited Medfusion's Birmingham headquarters, and received no oversight or direction from Medfusion employees. Thus, Waters was able to spend most of his time at casinos or performing other non-work related tasks. An FBI investigator (who reviewed Waters's bank records, casino records, and Medfusion company credit

27

card records) used records to estimate the number of workdays that Waters spent gambling at a casino. She reported that Waters gambled at a casino: (1) 72 or 73 workdays in 2007; (2) 85 workdays in 2008; and (3) 60 workdays in 2009.

Additionally, Medfusion's payments to Waters were significantly greater than what Medfusion paid other sales representatives, including Williams and Chestang. Williams's annual salary was $60,000 and Chestang's was $85,000. In comparison, the least annual amount that Waters received from Medfusion was $325,000 in 2009. Nevertheless, Williams and Waters had the same job titles and substantially the same responsibilities at Medfusion.

Moreover, although Waters's contracts required him to comply "with all policies and procedures relating to the reimbursement of . . . expenses," Medfusion did not require Waters to submit receipts for his credit card expenditures or to prepare expense reports. Nor did Medfusion include on W-2 forms Waters's credit card spending as compensation.

With this general background, we next discuss the Anti-Kickback statute and then the government's appeal in Chris Vernon's case.

### III.  THE ANTI-KICKBACK STATUTE

The Anti-Kickback statute is the basis for the charges against both Vernons. 42 U.S.C. § 1320a-7b(b). Section 1320a-7b(b), entitled "Illegal remunerations," has two subsections: 1320a-7b(b)(1) and 1320a-7b(b)(2). We set forth in full

28

subsections (b)(1) and (b)(2) to lay the foundation for our analysis of the issues on appeal.

Subsection (b)(1) of the statute criminalizes the soliciting or receiving of money in return for the referral of Medicaid clients for the furnishing of items or services as follows:

> (1) whoever knowingly and willfully <u>solicits or receives</u> any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—
>
>> (A) <u>in return for referring an individual</u> to a person <u>for the furnishing</u> or arranging for the furnishing <u>of any item or service</u> for which payment may be made in whole or in part under a Federal health care program, or
>>
>> (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,
>
> shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

<u>Id.</u> § 1320a-7b(b)(1) (emphasis added).

Then, subsection (b)(2) of the statute criminalizes the offering or paying of money in return for referral of Medicaid patients for the furnishing of items or services as follows:

> (2) whoever knowingly and willfully <u>offers or pays</u> any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person <u>to induce such person</u>—

29

(A) <u>to refer an individual</u> to a person <u>for the furnishing</u> or arranging for the furnishing <u>of any item or service</u> for which payment may be made in whole or in part under a Federal health care program, or

(B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program,

shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

<u>Id.</u> § 1320a-7b(b)(2) (emphasis added).

The two subsections are effectively the two sides of the same illegal kickback coin: subsection (b)(1) criminalizes the soliciting or receiving of the kickback and subsection (b)(2) criminalizes the offering or paying of the kickback.

## IV.  NO. 12-12767, UNITED STATES V. CHRIS VERNON

As stated, the jury found Chris Vernon guilty of the three substantive Anti-Kickback statute violations alleged in counts ten, eleven, and twelve.  Specifically, the jury convicted Chris Vernon of paying kickbacks, directly or indirectly, to HMS/Lori Brill for referrals of factor medication clients, as shown by these three Medfusion corporate checks:

- No. 011407, a check dated June 23, 2008, for $35,345.49, payable to "Hemophilia Management Specialties, Inc.";

30

- No. 013896, a check dated November 30, 2008, for $20,512.79, payable to "Hemophilia Management Specialties, Inc."; and

- No. 017649, a check dated August 12, 2009, for $18,759.27, payable to "Hemophilia Management Specialties, Inc."

Post-trial, the district court granted Chris Vernon's motion for a judgment of acquittal on counts ten, eleven, and twelve involving HMS, which the government appeals.[5]

"The District Court's determination that the evidence introduced at trial was insufficient to support the jury's verdict of guilt is [an] issue of law entitled to no deference on appeal." United States v. Miranda, 425 F.3d 953, 959 (11th Cir. 2005) (internal quotation marks omitted). Rather, "[w]e review de novo a district court's decision to grant a judgment of acquittal." United States v. Khanani, 502 F.3d 1281, 1295 (11th Cir. 2007).

In addition, we "view the evidence in the light most favorable to the government, and determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." Miranda, 425 F.3d at 959 (internal quotation marks omitted). "The prosecution need not rebut all reasonable hypotheses other than guilt" and the "jury is free to choose between or among the conclusions to be drawn from the evidence presented at trial." Id. (internal

---

[5]The government does not appeal the district court's pre-trial dismissal of counts fourteen through seventeen against Chris Vernon regarding payments to co-defendant Leroy Waters.

31

quotation marks omitted).  Importantly, "the district court must accept all reasonable inferences and credibility determinations made by the jury." Id. (internal quotation marks omitted).

We now examine the elements of the Anti-Kickback crime, which is the subject of counts ten, eleven, and twelve, and then the relevant evidence as to Chris Vernon.

## A.    The Anti-Kickback Statute

To convict Chris Vernon of substantive violations of the Anti-Kickback statute, the government needed to prove that he (1) knowingly and willfully, (2) paid money, directly or indirectly, to HMS/Lori Brill, (3) to induce her to refer individuals to Medfusion for the furnishing of factor medication, (4) paid for by Medicaid.  See 42 U.S.C. § 1320a-7b(b)(2)(A).

Chris Vernon does not dispute that Medicaid paid Medfusion for furnishing factor medication and that in turn, Medfusion paid 45 percent of its profits to HMS.  Rather, he argues the evidence failed to show he actually signed the Medfusion checks that paid HMS and that even if he did, the evidence still failed to show the required referral and willfulness elements of the charged crime.  We address each argument in turn.

## B.    Evidence that Chris Vernon Paid HMS

As to who signed Medfusion's checks, the government introduced copies of the three Medfusion corporate checks payable to HMS that were charged in counts ten, eleven, and twelve.  Although no handwriting expert testified, the jury readily could conclude from a visual examination of the physical checks that they are signed "Chris Vernon" when compared to other examples of Chris's signature shown on documents introduced at trial.

Furthermore, the evidence showed the defendant Chris Vernon was the CFO of Medfusion from 2006 to 2009, which further suggests he signed these three checks in June 2008, November 2008, and August 2009 respectively.  Indeed, as early as July 27, 2006, Chris Vernon signed a Medfusion letter requesting a "motor vehicle report" on Leroy Waters and written next to the Chris Vernon signature is "CFO."  This 2006 signature is nearly identical to the signature on the three checks payable to HMS.  The government also introduced Medfusion's "Employee Reference Manual," dated December 2008, which contained an organizational chart, showing that Chris Vernon was Medfusion's CFO.

In addition, Candi Williams testified that, when she started working at Medfusion in 2006, she thought that Chris Vernon "was the accountant." Similarly, the government introduced a copy of an April 6, 2009, email which Chris Vernon signed as "Chief Financial Officer / MedfusionRx, LLC."  In this email, Chris Vernon indicated his full knowledge of how Medfusion made sizable

33

payments to HMS, his involvement in the processing of the checks to HMS, and how he even knew Medicaid paid 100 percent reimbursement to Medfusion, but Blue Advantage paid only 80 percent:

> Please review the March 09 commission report for HMS. I have made a reduction to the payment for 16583.51. The reduction is for Ashley Sprinkle's previous commission payments for the dates of service from 6-1-08 until 2-28-09. Ashley changed insurance from Medicare/Medicaid to Blue Advantage. We were told her claims would pay at 100% because she would meet the low income subsidy dual eligible requirements. Blue Advantage does confirm that she is dual eligible but continues to pay her claims at 80% of the allowable.
>
> I have exhausted every avenue to appeal the payment from Blue Advantage. If the 20% is recovered I will reissue payment to HMS. I have removed Ashley Sprinkle from the March 09 spreadsheet and will continue to reduce all future dispenses unless reimbursement changes.
>
> Let me know if it is ok to issue the March payment.

In light of all of this evidence, a reasonable jury readily could find that Chris Vernon was Medfusion's CFO when each of the three checks were written, and that, in his capacity as CFO, he actually signed the checks. Thus, the evidence amply established that Chris Vernon "paid remuneration" to HMS.

## C.    Payments "To Induce" HMS "to Refer" Patients to Medfusion

As to the referral element, we also reject Chris Vernon's argument that the evidence was insufficient to establish that Medfusion made payments to HMS "to induce" HMS "to refer an individual" to Medfusion for the furnishing of factor medication. See 42 U.S.C. § 1320a-7b(b)(2)(A) (emphasis added). Chris Vernon

34

contends that the word "refer," as used in the statute, is a term of art that means "a request <u>by a physician</u> for an <u>item or service</u>."  He argues that because Lori Brill is not a physician, she could not "refer" patients to Medfusion within the meaning of subsection (b)(2)(A) of § 1320a-7b.

This argument wholly fails because the plain language of the statute is not limited to payments to physicians who prescribe medication.  Rather, it speaks broadly to "whoever knowingly and willfully . . . pays any remuneration" to "<u>any person</u> to induce such person . . . to refer an individual" to Medfusion for an item or service paid by Medicaid.  <u>Id.</u> (emphasis added).

Chris Vernon argues subsections (b)(2)(A) and (b)(2)(B) of the Anti-Kickback statute distinguish between the actions of doctors in subsection (b)(2)(A) and laypersons working in the health care field in subsection (b)(2)(B).  <u>See</u> <u>id.</u> § 1320a-7b(b)(2)(A)–(B).  We disagree because these subsections distinguish between the referral of persons in subsection (b)(2)(A) and obtaining of goods and services in subsection (b)(2)(B); they do not make the distinction Chris Vernon argues.  The text of the statute alone adequately refutes Chris Vernon's argument.

In addition, we are persuaded by the Seventh Circuit's decision in <u>United States v. Polin</u>, 194 F.3d 863 (7th Cir. 1999), which rejected a similar argument. In <u>Polin</u>, the Seventh Circuit affirmed the Anti-Kickback statute convictions of two defendants, who were employees of a pacemaker monitoring service.  The

35

defendants made payments to an independent pacemaker sales representative, Matthew Haberkorn, based on the number of patients referred by Haberkorn to the defendants' employer for pacemaker monitoring services.  Id. at 864–65, 867. The evidence showed that Haberkorn was responsible for selecting an outside monitoring service once a physician determined that such services were necessary and that although "the physician had the right to refuse any [monitoring] service he chose, . . . [Haberkorn] had never been overruled by a physician during his fourteen year career."  Id. at 865.

Nevertheless, the two defendants in Polin argued, as Chris Vernon does here, that their payments to Haberkorn, who referred patients, did not violate the statute because only a physician can "refer" a patient.  The Seventh Circuit disagreed, holding that the defendants' reading of the statute would "lead to absurd results."  Id. at 866.  Because there was sufficient evidence that Haberkorn had the capacity "to refer" patients, the defendants' payments to Haberkorn gave rise to "a classic case of an illegal kickback prohibited by [the Anti-Kickback statute in] 42 U.S.C. § 1320a-7b(b)(2)(A)."  Id. at 867.

Like the sales representative Haberkorn in Polin, in this case Lori Brill was effectively responsible for deciding which specialty pharmacy to use for the filling of her HMS patients' prescriptions.  There was overwhelming evidence that Lori Brill and other HMS employees, as "patient advocates," had the capacity to, and

36

did, refer their hemophiliac clients to Medfusion for the filling of their factor medication prescriptions. Some of HMS/Lori Brill's hemophiliac clients did not even know which pharmacy filled their prescriptions because they gave control of that decision to Lori Brill. The fact that Lori Brill and her HMS employees could not actually prescribe the factor medication is irrelevant.

Additionally, in United States v. Starks, 157 F.3d 833 (11th Cir. 1998), this Court affirmed convictions under the Anti-Kickback statute based on payments made by Andrew Siegel, the non-physician director of a drug addiction treatment center, to Angela Starks and Barbara Henry who were "community health aides" working for a non-profit agency that advised pregnant women about possible treatment for drug abuse. Id. at 835–37. Siegel instructed his employee to pay a total of $250 for each patient Starks and Henry referred to the treatment center Siegel operated. Id. at 836. Starks and Henry were not physicians and could not prescribe treatment for the women they advised. See id. at 835–36. Nevertheless, this Court affirmed the Anti-Kickback statute convictions of Siegel and Starks (Henry did not appeal). Id. at 842. While the specific argument Chris Vernon makes here was not made in Starks, the facts and the outcome in Starks are instructive.

We recognize that Chris Vernon relies on United States v. Miles, 360 F.3d 472 (5th Cir. 2004), but that case is materially different. In Miles, the two

defendants owned and operated Affiliated Professional Home Health ("APRO"), a home health care company, and paid a public relations firm, Premier, to distribute APRO's marketing literature, business cards, and baked goods to doctors. Id. at 475, 479. When a doctor prescribed home health care services, and the doctor's staff decided to use APRO, the doctor or a member of his staff contacted Premier and provided the patient's billing information. Id. at 480. Premier then passed that information on to APRO, who paid Premier an additional $300 for each Medicare patient who became a client as a result of the firm's marketing efforts. Id. at 479–80.

On appeal, the Miles defendants argued that they did not violate subsection (b)(2)(A) of the Anti-Kickback statute because Premier "never actually referred anyone . . . , but simply engaged in advertising activities on behalf of APRO." Id. at 480. The Fifth Circuit agreed, holding that APRO's payments to Premier were not to induce a referral of a patient, because there was "no evidence that Premier had any authority to act on behalf of a physician in selecting the particular home health care provider." Id. Premier also had no relationship with the patients. See id. In short, "[t]he payments from APRO were not made to the relevant decisionmaker as an inducement or kickback for sending patients to APRO." Id. (emphasis added). In contrast, Medfusion's payments were made to the relevant

decisionmaker, Lori Brill, as she had her own personal and existing relationships with her clients and decided where to fill her clients' prescriptions.

Even the Fifth Circuit in Miles specifically recognized "certain situations where payments to non-doctors would fall within the scope of the statute" and discussed Polin approvingly. Id. at 480–81 ("Under our reading of the statute, because the salesman in Polin was the relevant decisionmaker and his judgment was shown to have been improperly influenced by the payments he received from the monitoring service, the Seventh Circuit correctly upheld the conviction of the individuals who paid the salesman in Polin.").

As his last no-referral argument, Chris Vernon contends that a patient could only be "referred" to Medfusion if he was not already a Medfusion customer, and that, at the times in 2008 and 2009 that the three checks alleged in the indictment were issued, the patients already had been Medfusion customers for some time. This argument also fails because the payments here were made for the continuing referral of these patients by HMS/Lori Brill. The patients did not have contracts with Medfusion that required them to fill their prescriptions with Medfusion. At any time, Lori Brill could have moved their business to other specialty pharmacies. To adopt Chris Vernon's argument would lead to the absurd result that the first kickback payment for a referral is unlawful, but future kickback payments for the

39

same patient are lawful because they are not for an initial "referral."  We decline to graft such a counterintuitive principle onto the Anti-Kickback statute.

In sum, there was sufficient evidence that Chris Vernon made not just payments, but sizeable ones to HMS/Lori Brill for the purpose of inducing Lori Brill to refer her Medicaid clients to Medfusion for prescription-filling services. And there was extensive evidence (and no dispute on appeal), that several of HMS's clients were Medicaid recipients and that their prescriptions were covered by Alabama Medicaid.

## D.    Evidence that Chris Vernon Acted "Willfully"

There was also ample evidence for a reasonable jury to conclude that Chris Vernon acted "willfully" as required by § 1320a-7b(b)(2).  The evidence showed that Chris Vernon, as CFO, signed the three checks, knew HMS/Lori Brill was not an employee of Medfusion but a third party entity, and knew the Medfusion's payments to her were payments for her referring clients to Medfusion for prescription filling.  The parties do not dispute the nature of the statute's willfulness standard but only whether the evidence sufficiently established it as to Chris Vernon.  We discuss what constitutes willfulness and then the evidence.

40

The Anti-Kickback statute does not define the term "willfully."[6]  However, in another Anti-Kickback statute case, this Court concluded that the Eleventh Circuit Pattern Jury charge appropriately defines "willfully."  Starks, 157 F.3d at 837–38.  In Starks, we affirmed the district court's jury instruction that the word "willfully," "means the act was committed voluntarily and purposely, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law."  Id. (quoting 11th Cir. Pattern Jury Instr. 9.1).  Here, the district court gave this same pattern instruction.

Consistent with Starks, the district court here also advised the jury that "[w]hile a person must have acted with the intent to do something that the law forbids before you can find that the person acted willfully, the person need not be aware of the specific law or rule that his or her conduct may be violating."  This Court in Starks rejected the defendants' argument that the Anti-Kickback statute requires that a defendant had to have known that a specific "referral arrangement violated the Anti-Kickback statute in order to be convicted."  Starks, 157 F.3d at 837.  We held that "[the Anti-Kickback statute] is not a highly technical tax or financial regulation that poses a danger of ensnaring persons engaged in apparently innocent conduct."  Id. at 838.  Rather, "the giving or taking of kickbacks for

---

[6]Neither party disputes that Chris Vernon acted "knowingly."  Thus, we address only the willfulness aspect of the statute's mens rea requirement.

41

medical referrals is hardly the sort of activity a person might expect to be legal."

Id.

Here, the evidence more than sufficiently showed Chris Vernon's willfulness. Before the June and November 2008 checks, Chris Vernon knew: (1) the commission-based nature of Medfusion's payments to HMS/Lori Brill; (2) that Lori Brill was not an employee of Medfusion; and (3) that the Anti-Kickback statute criminalizes such commission-based arrangements between health care providers and third parties.

Chris Vernon knew that Medfusion was paying HMS/Lori Brill 45 percent of the profits that it received from filling factor medication prescriptions for her HMS clients during 2008. Chris Vernon sent a chart to Jeff Vernon showing, for the time period from September 2007 to October 2008, the profit of Medfusion and the 45 percent calculation of the commission being paid to Lori Brill. As CFO, Chris Vernon knew the monthly payments routinely exceeded $10,000. In April 2008, Chris Vernon received from Medfusion's attorney, Benefield, the proposed Medfusion-HMS/Lori Brill contract which referred to HMS as an "independent contractor" of Medfusion. The contract included a "Payment Table" that set forth the commission-based structure of HMS's compensation from Medfusion. The payment table provided that Lori Brill/HMS would receive a "Representative Fee Percentage of Collected Gross Profit." That percentage was to be: (1) 50 percent

42

when it took less than 90 days for Medfusion to receive payment for filling a prescription for an HMS client; (2) 47.5 percent when Medfusion received payment within 91 to 180 days; and (3) 45 percent when Medfusion did not receive payment for 181 days or more.  Although Lori Brill did not sign it, the proposed contract was to put in writing Medfusion-HMS/Lori Brill's previous and ongoing financial agreement.[7]

Emails further established that Chris Vernon was intricately involved with the actual calculation and payment of commissions to HMS/Lori Brill.  These emails, although written in 2009, evidenced a continued, unchanged financial relationship between Medfusion and HMS/Lori Brill during 2008 and 2009.  For example, in the April 6, 2009, email, Chris Vernon told Jeff Vernon that he had "made a reduction to [HMS/Lori Brill's] payment for 16583.51" and advised that "[t]he reduction [was] for Ashley Sprinkle's previous commission payments for the dates of service from 6-1-08 until 2-28-09."

Further, on June 8, 2009, Lori Brill sent an email to Chris and Jeff Vernon, writing:

---

[7]In concluding that the government had not met its burden of proving willfulness, the district court stressed that "[t]here was no evidence at trial that Chris Vernon was involved in procuring the contract with HMS, that he was aware of the services to be provided for payment, or that he ever participated in discussions concerning its legality."  We need not consider what role Chris Vernon played in the preparation of the unsigned Medfusion-HMS/Lori Brill contract. There was ample evidence indicating that, even if Chris Vernon did not actively participate in the procuring of that contract, he was familiar with its terms.

43

Chris and Jeff,
[C]ould you please review the distribution report you sent for May 2009[?]  You reported the net profit as my commission for May and then paid HMS 45% of my commission instead of the profit.  The profit to be commissioned on was $60,544.48.  Could you please send out any adjustments as soon as possible[?]
. . . .
Lori Brill
Hemophilia Management Specialties, Inc.

On August 3, 2009, Chris Vernon forwarded to Jeff Vernon a chart detailing Medfusion's profits made from patients referred by Lori Brill.  That chart lists: (1) prescriptions that Medfusion filled for HMS patients between January 12, 2009, and July 28, 2009; (2) the amounts that Medfusion received from insurers for filling those prescriptions; (3) the costs of those prescriptions to Medfusion; (4) Medfusion's profits earned for each prescription; and (5) Medfusion's profit margin for each prescription.

Additionally, Chris Vernon knew that the Anti-Kickback statute makes criminal commission-based payments by a health care provider to a non-employee, like the payments Medfusion made to HMS/Lori Brill.  Chris Vernon was a sophisticated businessman, at the helm of a company that did many million dollars in sales by 2010.

In November 2008, Medfusion's own "corporate compliance plan" advised Chris Vernon: (1) that "[a]ll employees shall comply with anti-kickback laws"; (2) "[t]he federal anti-kickback laws are written to prevent MedfusionRX, LLC

44

personnel and representatives from knowingly and willfully . . . <u>paying</u> . . . or receiving any money . . . <u>directly or indirectly from third parties in connection with items or services billed to federal programs</u>"; and (3) "[a]ll personnel and representatives must be aware the payment may be unlawful even if the only purpose of a payment scheme is to influence referrals."  This plan included various references to the CFO's role in administering this plan and even instructed that "[e]mployees in the finance department . . . are expected to be vigilant in identifying potential violations."

Chris Vernon was also privy to Benefield's 2009 email conversations with Jeff Vernon about Medfusion's failed attempts to bring the Medfusion-HMS/Lori Brill relationship into compliance with the Anti-Kickback statute.  On April 21, 2009, Medfusion's attorney, Benefield, sent a copy of the unsigned Medfusion-HMS/Lori Brill contract to James Pool, an attorney specializing in health care regulation.  Around that time, a large private equity company, Cressey and Company ("Cressey"), was considering purchasing Medfusion.  During the due diligence process, Cressey's executives wanted to ensure that certain Medfusion contracts and business relationships, including its relationship with HMS/Lori Brill, complied with health care regulatory statutes like the Anti-Kickback statute. In response to this request, Benefield solicited Pool's opinion on the HMS/Lori Brill relationship and asked him "if there wasn't some way that he could come up

45

with . . . to structure this relationship so that it would fall within a check-the-box safe harbor [of the Anti-Kickback statute]."

Pool was not able to come up with a way to ensure that the Medfusion-HMS/Lori Brill relationship fell under a safe harbor provision, and Chris Vernon knew about Pool's unsuccessful efforts. For example, after Benefield sent Jeff Vernon an invoice for Pool's work, Jeff Vernon replied to Benefield and Chris Vernon: "We will pay it. That is a substantial amount of money with no answers. Has he come up with anything on HMS yet?" A few weeks later, Jeff Vernon sent another email to Benefield and Chris Vernon, writing: "Is it not possible for Jim Poole [sic] to come up with a contract where we get paid a rate as a pharmacy service provider that would eliminate the kickback risk or put it on Lori?"

Although Pool was unable to restructure the Medfusion-HMS/Lori Brill relationship to make it lawful, that did not stop Medfusion from trying to "eliminate the kickback risk or put it on Lori." On July 14, 2009, Jeff Vernon emailed Victor Espinosa, an employee or executive of another specialty pharmacy, carbon copying Chris Vernon. In that email, Jeff Vernon wrote,

> We are in the process of restructuring MedfusionRx and we have one sales person that is similar to your affiliates. Our council [sic] has concerns about anti-kickback statutes. Is it possible for you to refer me to your council [sic] since they would be familiar with the situation?

By the time Chris Vernon signed the August 12, 2009, check, he knew attorney Pool had effectively concluded Medfusion's relationship with HMS/Lori Brill violated the Anti-Kickback statute.[8]

Lest there be any doubt, by the time of the August 12, 2009 payment, Chris Vernon also had received concerns in a July 31, 2009 email from Stacy Walton, Medfusion's corporate compliance officer, about "creative charting" to make it appear that Medfusion was satisfying the factor medication–logging and home visit requirements for Sprinkle and Goodwin as to factor medication, even though it had not done so. Three days later, Jeff Vernon responded to Walton and Chris Vernon. He instructed Chris Vernon: "[L]et me know which patients of Lori's have received meds the last two months." He instructed Walton to arrange for Ashley Sprinkle and Travis Goodwin to receive home visits and for Walton to "get charts up to speed."[9]

---

[8]Chris Vernon argues that, under the Anti-Kickback statute, a transaction might not fall under one of the safe harbor provisions, and yet still comply with the statute. Thus, he contends that this evidence does not necessarily show that Chris Vernon suspected that the relationship between Medfusion and HMS was unlawful; only that he suspected that it did not fall under a safe harbor provision. But Medfusion was making an effort to fit the relationship within a safe harbor provision of the Anti-Kickback statute, from which effort a jury could infer that, absent a safe harbor provision, Medfusion was concerned that the relationship would be illegal.

[9]Chris Vernon argues that we should read the phrase "creative charting" to refer to "an administrative concern . . . — not a concern about fraud." While it is plausible that the phrase might refer to something other than the falsifying of records submitted to Medicaid, in this appeal of a grant of a motion for a judgment of acquittal, we view the evidence in the light most favorable to the government. Thus, we conclude that a reasonable jury could, not that it necessarily would be required to, construe the phrase as a reference to fraud.

47

Given that Chris Vernon not only knew that Medfusion was paying HMS/Lori Brill commissions based on her referrals of factor medication clients, but also was aware that paying such kickbacks was illegal, a reasonable jury easily could have found that he acted willfully when he signed each of the three Medfusion checks payable to HMS.

Chris Vernon points out that this Court affirmed a jury's finding of willful violations of the Anti-Kickback statute where the violative transactions had occurred in cash, and in various covert locations. See Starks, 157 F.3d at 836–37. Chris Vernon stresses that the Medfusion payments to HMS were routine business checks. However, nothing in Starks states that furtive activity is required to establish willfulness under the Anti-Kickback statute. Such a requirement would be contrary to the clear statutory language, which criminalizes the paying of "any remuneration . . . overtly or covertly." 42 U.S.C. § 1320a-7b(b)(2). In addition, this Court in Starks merely stated that the evidence of furtiveness indicated that the defendants knew they were breaking the law. 157 F.3d at 839 n.8. Here, there was more than sufficient evidence that Chris Vernon actually knew that Medfusion's payments to HMS/Lori Brill violated the Anti-Kickback statute.

Because ample evidence supported the jury's guilty verdicts on counts ten, eleven, and twelve, the district court erred in granting Chris Vernon's motion for a judgment of acquittal on those counts.

48

**E.     Alternative Grant of Motion for New Trial**

In the alternative to an acquittal, the district court also granted Chris Vernon's motion for a new trial. The district court explained that "'the evidence preponderates sufficiently [heavily] against the verdict that a serious miscarriage of justice may have occurred.'" The government appeals this alternative holding too.

"[W]e review the grant of a new trial based on the weight of the evidence more closely than the grant of a new trial on other grounds." United States v. Almanzar, 634 F.3d 1214, 1222 (11th Cir.), cert. denied, 132 S. Ct. 316 (2011). While "we do not review the grant of a new trial based on the weight of the evidence de novo, our review is not much different." Id. (internal quotation marks omitted). This is because "we want to be sure that the judge did not simply substitute her judgment for that of the jury." Id. (internal quotation marks and alterations omitted). Accordingly, when the record establishes that the evidence did not "preponderate so heavily against the jury's verdict as to lead to a 'miscarriage of justice,' we will conclude that the district court . . . exceeded its authority by granting a new trial." Id. (additional internal quotation marks and alterations omitted).

For the reasons just explained, the trial evidence did not preponderate so heavily against the jury's guilty verdicts as to cause a miscarriage of justice. Thus, the district court erred in granting Chris Vernon's motion for a new trial.

49

In sum, we vacate the district court's award of a judgment of acquittal to Chris Vernon on counts ten, eleven, and twelve, and we reverse the alternative award of a new trial on those counts. We remand so that the district court can enter judgment on the jury's verdict on counts ten, eleven, and twelve and proceed to the sentencing phase on Chris Vernon's three convictions.

### V.  NO. 12-13311, UNITED STATES V. JEFF VERNON

We now turn to the appeal of co-defendant, Jeff Vernon, Medfusion's CEO during the period from 2007 to 2009. The jury convicted Jeff Vernon of the substantive violations of the Anti-Kickback statute in counts ten through twelve and fifteen through seventeen, and of the conspiracy to make unlawful referral payments in count fourteen. We affirm these convictions and explain why Jeff Vernon's arguments on appeal lack merit.

### A.    Jury Instructions and Alleged Duplicitous Indictment

Jeff Vernon alleges that each of the six substantive anti-kickback counts in the indictment (counts ten through twelve and fifteen through seventeen) were duplicitous and that the jury instructions erred by not curing that problem. Specifically, as to these six substantive counts, Jeff Vernon argues that his indictment was unconstitutionally duplicitous because each count did not allege a single crime, but improperly combined two separate crimes: (1) a violation of § 1320a-7b(b)(1), which prohibits soliciting or receiving kickbacks, and (2) a

50

violation of § 1320a-7b(b)(2), which prohibits <u>offering or paying</u> kickbacks.  Jeff

Vernon asserts that the jury instructions failed to cure this duplicity.  As a result,

Jeff Vernon argues, the jury may have issued a non-unanimous verdict because

some jurors may have convicted him of soliciting or receiving kickbacks, in

violation of § 1320a-7b(b)(1), while other jurors may have convicted him of the

separate crime of offering or paying kickbacks, in violation of § 1320a-7b(b)(2).

As an initial matter, Jeff Vernon failed to preserve his arguments in the

district court, both regarding the indictment and the jury instructions, thereby

warranting review only for plain error.  See <u>United States v. Barrington</u>, 648 F.3d

1178, 1190 & n.6 (11th Cir. 2011) (reviewing for plain error unpreserved

challenges to a duplicitous indictment and jury instructions).[10]

The district court set a deadline of September 26, 2011, by which the parties

had to file all pretrial motions under Federal Rule of Criminal Procedure 12(b),

including motions alleging defects in the indictment.  Yet Jeff Vernon first alleged

that the indictment was duplicitous on December 12, 2011, long after the court-

ordered deadline, when he joined Chris Vernon's motion to dismiss the indictment.

---

[10]Under plain error review, we ask whether there was "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" <u>Johnson v. United States</u>, 520 U.S. 461, 466–67, 117 S. Ct. 1544, 1549 (1997) (alteration in original) (quoting <u>United States v. Olano</u>, 507 U.S. 725, 732, 113 S. Ct. 1770, 1776 (1993)).  If these three conditions are met, "an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" <u>Id.</u> at 467, 117 S. Ct. at 1549 (alteration and some internal quotation marks omitted) (quoting <u>Olano</u>, 507 U.S. at 732, 113 S. Ct. at 1776).

In response to this motion to dismiss, the government argued that Chris and Jeff Vernon's duplicity allegation "should be struck as untimely" and that, alternatively, the allegation was meritless. The district court summarily denied the Vernons' motion to dismiss the indictment "for reasons stated in the Government's response."

Because the district court rejected Jeff Vernon's duplicity argument at least in part on grounds of untimeliness, Jeff Vernon has waived that argument in the district court. See Fed. R. Crim. P. 12(e) (stating that a party waives a defective-indictment defense or objection "not raised by the deadline the court sets," unless the court grants relief from the waiver for good cause). Furthermore, Jeff Vernon never objected to the jury instructions on grounds that they failed to cure the allegedly duplicitous indictment or somehow compounded the error.

Given the plain-error standard of review, Jeff Vernon's challenges to the indictment and jury instructions readily fail. Even if we assume that the indictment was somehow duplicitous, Jeff Vernon has shown no prejudice flowing from this alleged defect. To reiterate, the essence of Jeff Vernon's argument is that the duplicitous indictment caused a non-unanimous jury verdict because some jurors may have convicted him of soliciting and receiving kickbacks under § 1320a-7b(b)(1), rather than offering or paying kickbacks under § 1320a-7b(b)(2), or may have improperly combined elements of both offenses. But the record shows

52

absolutely no danger of a non-unanimous jury verdict on the substantive anti-kickback counts.

First, although each of the six substantive counts combined the elements of § 1320a-7b(b)(1) and (b)(2), the indictment as a whole made clear that Jeff Vernon was charged only with subsection (b)(2), that is, offering or paying kickbacks. Each of the six challenged substantive counts expressly incorporated the "Manner and Means" and "Overt Acts" of the conspiracies alleged in counts nine and fourteen. In the "Manner and Means" sections of the conspiracy counts, the indictment alleged that Jeff and Chris Vernon "increased their profits by inducing" Lori Brill or Leroy Waters "to refer [Lori Brill's and Waters's] patients to Medfusion. This inducement was accomplished by knowingly and willfully paying kickbacks to [Lori Brill and Waters] in the form of commission payments." Moreover, in the "Overt Acts" section, the indictment alleged that Lori Brill and Waters, not Jeff or Chris Vernon, received commission checks from Medfusion. Thus, the indictment made clear that Jeff and Chris Vernon were paying the kickbacks and Lori Brill and Waters were receiving them.

To the extent the indictment left any possible doubt in the minds of the jury as to the allegations against Jeff Vernon, the evidence presented at trial quashed any doubts. As discussed elsewhere in this opinion, the trial evidence showed exactly what was alleged in the indictment, namely, that Jeff and Chris Vernon

53

paid kickbacks through Medfusion to obtain patient referrals.  There was no evidence whatsoever that either Jeff or Chris Vernon received kickbacks.  In fact, any such evidence would have made little sense in the context of this fraud scheme, where the Vernons controlled Medfusion which was paid by Medicaid or other insurance companies, not by Lori Brill or Waters.  See United States v. Park, 421 U.S. 658, 674, 95 S. Ct. 1903, 1913 (1975) ("[I]n reviewing jury instructions, our task is also to view the charge itself as part of the whole trial.").

Furthermore, the district court made clear to the jury that the six substantive counts charged Jeff Vernon with violating subsection (b)(2), that is, offering or paying kickbacks.  Specifically, in summarizing the charges in counts ten through twelve, the district court explained:

> And then counts 10 through 12 relate only to Lori Brill, and Jeff Vernon, Chris Vernon, and allege that from December '07 to September '09 that they violated the statute by Medfusion paying commissions to HMS as follows: 10, 11, and 12.

The district court provided a similar explanation of counts fifteen through seventeen, stating:

> Counts 15 through 17 relate only to Jeff Vernon and alleges [sic] that in or about December '07 and continuing through September '9 [sic] that he violated the statute by Medfusion paying commissions to Leroy Waters, as follows.  Look at the top of page 18, and that's how those counts are delineated, 15, 16, and 17.

In light of the foregoing, there is no possibility that the alleged defects in the indictment or the jury instructions confused the jury or caused the jury to convict

54

Jeff Vernon of anything other than offering or paying kickbacks, in violation of subsection (b)(2).  See United States v. Gibson, 708 F.3d 1256, 1275 (11th Cir. 2013) ("We will not reverse a defendant's conviction based on a challenge to the jury charge unless we are left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations."  (internal quotation marks omitted)).  Thus, Jeff Vernon has not shown any plain error in this regard.

## B.    Alleged Misstatements of the Law in the Jury Instructions

For the first time on appeal, Jeff Vernon also argues that the jury instructions on both the substantive counts and the conspiracy count misstated the law.  We review these jury instruction issues for plain error also.

To recall, the district court's instructions on the six substantive counts against Jeff Vernon provided:

> Now, a defendant can be found guilty of [violating the Anti-Kickback statute] only if all of the following facts are proved beyond a reasonable doubt: One, that the defendant knowingly and willfully offered, paid, solicited, or received remuneration; the remuneration was offered, paid, solicited, or received at least in part to induce or in exchange for the referral of a patient insured by a federal health care program; and, the patient's services were covered in whole or in part by a federal health care program.

This jury instruction differs somewhat from the applicable statutory provision, which prohibits the payment of kickbacks "to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for

55

which payment may be made in whole or in part under a Federal health care program." 42 U.S.C. § 1320a-7b(b)(2)(A).

Jeff Vernon contends that the jury instruction misstated the law because it allowed the jury to convict him without finding the required nexus between the improper referrals and Medicaid coverage: that is, without finding that Jeff Vernon and Medfusion paid kickbacks for the referral of patients whose factor medication prescriptions were covered by Medicaid.  Jeff Vernon argues that the jury instructions allowed conviction so long as the referred patients received Medicaid benefits for some health care services, even services unrelated to the illegal referrals.  This argument fails.

First, the challenged instruction did not mislead the jury as to the required nexus between the patient referrals and Medicaid.  The last clause of the instruction required the jury to find that the "the patient's services were covered in whole or in part by a federal health care program," i.e., Medicaid.  Although the term "the patient services" was not mentioned elsewhere in the instruction, the jury easily could infer that "the patient services" were those provided by the payer of kickbacks, i.e., Jeff Vernon and Medfusion, to the referred patients.

Second, any doubt left by the instruction was cured when the jury took with it a copy of the indictment during deliberations.  The indictment set forth the required nexus between federal health care benefits and the services provided to

56

referred patients.  Moreover, the evidence presented at trial proved overwhelmingly that some of the factor medication Medfusion provided to HMS/Lori Brill's and Waters's patients was covered by Alabama Medicaid.  And Jeff does not dispute this fact on appeal.  Thus, we will not reverse Jeff Vernon's conviction on this ground.  See Johnson, 520 U.S. at 470, 117 S. Ct. at 1550 (holding that the omission of an element from a jury instruction did not warrant reversal under plain error review because there was overwhelming evidence on that element); see also Neder v. United States, 527 U.S. 1, 7–20, 119 S. Ct. 1827, 1833–39 (1999) (applying harmless error and affirming district court's conclusion that failure to instruct on the "materiality" element of the tax fraud offense was harmless beyond a reasonable doubt where "the omitted element was  uncontested and supported by overwhelming evidence").

Jeff Vernon next challenges the district court's instruction on count fourteen, the conspiracy to make unlawful referral payments to Waters.  The instructions on this count required the jury to find, in relevant part, that Jeff Vernon conspired "to knowingly and willfully offer, pay, solicit, and receive" kickbacks.  Jeff Vernon contends that this instruction misstated the law because it did not require the jury to unanimously agree as to whether Jeff Vernon conspired to "solicit[] or receive[]" a kickback in violation of subsection (b)(1), or "offer[] or pay[]" a kickback in violation of subsection

(b)(2). He argues that the district court erred by not instructing the jury that it had to agree as to which of two separate offenses he conspired to commit.

When an indictment alleges a conspiracy with multiple object offenses, the jury must unanimously agree on a specific object offense. United States v. Bradley, 644 F.3d 1213, 1300 n.147 (11th Cir. 2011). Once again, however, we need not decide whether subsections (b)(1) and (b)(2) create separate offenses because, as discussed above, the indictment and the trial evidence clearly showed that Jeff Vernon's role in the count fourteen conspiracy offense involved the specific object of offering or paying kickbacks to Waters, not soliciting or receiving kickbacks. Thus, it is highly unlikely that any jurors actually convicted Jeff Vernon of conspiring to solicit or receive kickbacks himself.

In sum, Jeff Vernon has not established plain error or any prejudice to his substantial rights as a result of any jury charge.

## C.    Alleged Constructive Amendment of the Indictment

Jeff Vernon also argues that the district court's jury instructions constructively amended the indictment as to count fourteen and as to counts fifteen through seventeen. Because Jeff Vernon did not raise his constructive-amendment argument before the district court, we review this issue only for plain error. See United States v. Dortch, 696 F.3d 1104, 1112 (11th Cir. 2012).

A constructive amendment of an indictment occurs when "the jury instructions so modify the elements of the offense charged that the defendant may have been convicted on a ground not alleged by the grand jury's indictment." United States v. Peel, 837 F.2d 975, 979 (11th Cir. 1988) (internal quotation marks and alteration omitted).  "In evaluating whether the indictment was constructively amended, we review the district court's jury instructions . . . 'in context' to determine whether an expansion of the indictment occurred either literally or in effect."  United States v. Castro, 89 F.3d 1443, 1450 (11th Cir. 1996).  A constructive amendment does not occur simply because a "jury instruction did not exactly match the form of the indictment" so long as "the substance of the indictment remained intact."  United States v. Moore, 525 F.3d 1033, 1046 (11th Cir. 2008).

Jeff Vernon first argues that the district court's instruction on the count fourteen conspiracy offense constructively amended the indictment.  We begin by setting forth count fourteen, entitled "18 U.S.C. § 371[,] Conspiracy to Violate Anti-Kickback Statutes":

> From in or about January 2007, to and continuing through in or about September 2009, in the Southern District of Alabama, Southern Division, and elsewhere, the defendants,

**LEROY WATERS,
JEFF VERNON, and
CHRIS VERNON**

59

did willfully, knowingly, and unlawfully combine, conspire, confederate, and agree together with each other and other persons, both known and unknown to the Grand Jury, to commit certain offenses against the United States, to-wit:

> to knowingly and willfully offer, pay, solicit, and receive any remuneration (including any kickback, bribe, or rebate), directly or indirectly, overtly or covertly, in cash or in kind in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, and in return for purchasing, leasing, ordering and arranging for or recommending purchasing, leasing, and ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.  In violation of Title 42, United States Code, Section 1320a-7b(b).

## Objective of the Conspiracy

. . . . The objective of the conspiracy was to increase the profits earned by LEROY WATERS, JEFF VERNON, and CHRIS VERNON.

## Manner and Means

. . . . JEFF VERNON and CHRIS VERNON increased their profits by inducing LEROY WATERS to refer his patients to Medfusion.  This inducement was accomplished by knowingly and willfully paying kickbacks to LEROY WATERS in the form of commission payments.  LEROY WATERS increased his profits by knowingly and willfully receiving these kickback payments in exchange for referring his patients to Medfusion.  Some of the patients LEROY WATERS referred to Medfusion were insured through federal healthcare programs.

. . . . The agreement between these three parties was that LEROY WATERS would receive a commission equal to fifty percent

of the profits generated by filling the Factor medication prescriptions of the patients he referred to Medfusion.

## Overt Acts

. . . . On or about April 6, 2007, LEROY WATERS received a commission check, numbered 002888, from Medfusion in the amount of $36,179.43.

. . . . On or about July 2, 2008, LEROY WATERS received a commission check, numbered 011237, from Medfusion in the amount of $6,000.00.

. . . . On or about September 17, 2008, LEROY WATERS received a commission check, numbered 013396, from Medfusion in the amount of $2,976.00.

In violation of Title 18, United States Code, Section 371.

Although count fourteen charged that the defendants agreed that "LEROY WATERS would receive a commission," and charged that the overt acts were instances where Waters "received a commission check," the district court told the jury that "[i]n [the] conspiracy alleged in count[] . . . 14, the overt acts alleged are the payments of the commissions." Similarly, when, in the context of the substantive counts, fifteen through seventeen, the district court described to the jury the specific commission payments set forth as overt acts in count fourteen, the district court stated that Jeff Vernon "violated the statute by Medfusion paying commissions to Leroy Waters."

Jeff Vernon argues that, whereas the indictment would have allowed the jury to convict him if it determined that Waters received commission payments from

61

any source, the district court instructed the jury that it could convict only if it determined that Medfusion made payments to Waters. This argument is meritless.

First, the "Overt Acts" section of the indictment expressly stated that Waters received commission checks "from Medfusion." Thus, the district court correctly instructed the jury that it could convict only if Medfusion made payments to Waters. Any failure on the part of the district court to "exactly match the form of the indictment" did not give rise to a constructive amendment. See Moore, 525 F.3d at 1046.

Moreover, if anything, the district court's charge narrowed the range of conduct on which Jeff Vernon could be convicted. A constructive amendment occurs when "the essential elements of the offense . . . are altered to broaden the possible bases for conviction beyond what is contained in the indictment." United States v. Keller, 916 F.2d 628, 634 (11th Cir. 1990) (emphasis added). As the Tenth Circuit has explained, "there is no fatal variance where a defendant is convicted upon evidence which tends to show a narrower scheme than that contained in the indictment, provided that the narrower scheme is fully included within the indictment." United States v. McClatchey, 217 F.3d 823, 833–34 (10th Cir. 2000) (internal quotation marks omitted).

Jeff Vernon also argues that the district court constructively amended the six substantive counts. Those counts alleged that Jeff Vernon "did knowingly and

willfully offer [or] pay . . . any remuneration . . . <u>in return for referring</u> an individual to a person for the furnishing or arranging for the furnishing of any [federally insured health care] item or service." The district court instructed the jury that, to convict, it needed to find that: "the remuneration was offered, paid, solicited, or received at least in part <u>to induce</u> or in <u>exchange for the referral</u> of a patient insured by a federal health care program."

Jeff Vernon contends that the district court constructively amended the indictment by replacing the "in return for referring" phrase with "to induce or in exchange for the referral." He apparently argues that the jury instruction language was broader than the indictment's language, and that the jury instructions encompassed even payments that did not ultimately result in referrals. Again, Jeff Vernon's argument is meritless.

As mentioned above, the six substantive counts expressly referenced the "Manner and Means" sections of the conspiracy counts, which alleged that Jeff and Chris Vernon "increased their profits by inducing" Lori Brill or Leroy Waters to refer patients to Medfusion. The indictment also referenced subsection (b) of the Anti-Kickback statute, 42 U.S.C. § 1320a-7b(b), which includes the phrase "to induce. " <u>See</u> 42 U.S.C. § 1320a-7b(b). The district court did not, therefore, err by including the statutory language in the instruction. <u>See</u> <u>United States v. Seher</u>, 562 F.3d 1344, 1357 (11th Cir. 2009) ("[T]he Fifth Amendment is satisfied if the

63

indictment makes a specific statutory reference to an essential element of the offense and contains some other indication from which we can infer that the grand jury found that element to be present.").

For all these reasons, Jeff Vernon failed to establish any constructive amendment of the indictment, much less a plainly erroneous one.

## D.    Denial of Rule 29 Motions for a Judgment of Acquittal

Jeff Vernon next appeals the district court's denial of his Rule 29 motions for a judgment of acquittal.  We review de novo the district court's denial of a Rule 29 motion.  United States v. Westry, 524 F.3d 1198, 1210 (11th Cir. 2008). However, in doing so, we view "the evidence in the light most favorable to the government" and we draw "all reasonable inferences and credibility choices in favor of the jury's verdict."  United States v. Tampas, 493 F.3d 1291, 1297–98 (11th Cir. 2007) (internal quotation marks omitted).  "If a reasonable jury could have found [Jeff Vernon] guilty beyond a reasonable doubt, then we cannot overturn the jury's determination."  United States v. McGuire, 706 F.3d 1333, 1336 (11th Cir. 2013) (internal quotation marks omitted).

Jeff Vernon contends that the government presented insufficient evidence to convict him under subsection (b)(2)(A) of the Anti-Kickback statute, which criminalizes the offering or paying of kickbacks "to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which

payment may be made in whole or in part under a Federal health care program."
42 U.S.C. § 1320a-7b(b)(2)(A).

Like Chris Vernon, Jeff Vernon argues that the government presented no evidence of "referrals," as only physicians can make "referrals," and HMS/Lori Brill and Waters made only "recommendations." We reject that argument for the reasons we gave in our discussion of Chris Vernon's appeal. HMS/Lori Brill and Waters were able to and indeed did make referrals within the meaning of the statute.

Jeff Vernon also contends that he did not make payments for referrals of individuals, and that, at most, the evidence showed that Lori Brill and Waters recommended the purchasing or ordering of factor medication from Medfusion. However, there was ample evidence that Lori Brill and Waters referred individuals to Medfusion.

Medfusion did not pay Lori Brill or Waters to recommend isolated purchases of a product; rather, it paid Lori Brill and Waters to refer individuals for the providing of a host of health care services. The agreement between Medfusion and Alabama Medicaid required Medfusion to provide its Medicaid-insured clients with more than just medication. The agreement also required Medfusion to provide its patients with, inter alia: (1) monthly contact with a caregiver; (2)

65

assistance in developing a medical treatment plan; and (3) tracking of the amount of medication the patient used each month.

Relatedly, Jeff Vernon maintains that the evidence showed that Lori Brill and Waters referred patients to Medfusion to purchase factor medication, not to obtain services. But as stated above, there was evidence that Medfusion agreed to provide patients with various health care services. Moreover, a reasonable jury could have concluded that the filling of prescriptions was a "service," as contemplated by the statute.

In sum, there was sufficient evidence for a reasonable jury to find that Jeff Vernon violated subsection (b)(2)(A).

Next, Jeff Vernon argues that the district court should have granted his Rule 29 motions because there was insufficient evidence for a reasonable jury to find beyond a reasonable doubt that he acted willfully.[11] Jeff Vernon's argument fails. There was ample evidence that Jeff Vernon acted "with the specific intent to do something the law forbids." See Starks, 157 F.3d at 838 (internal quotation marks omitted).

---

[11]We do not repeat here the standard for willfulness set forth in our discussion of Chris Vernon's appeal. This standard applies as to the substantive Anti-Kickback statute violations in counts ten through twelve and fifteen through seventeen, and the conspiracy in count fourteen. The parties do not dispute that the district court appropriately instructed the jury as to this standard.

A reasonable jury could have based a finding of willfulness on evidence that Jeff Vernon (1) knew the requirements of the Anti-Kickback statute, and (2) knew the unlawful nature of Medfusion's relationships with HMS/Lori Brill and with Waters—that Medfusion was paying these third parties commissions solely in exchange for referrals.

First, there was ample evidence that Jeff Vernon knew the Anti-Kickback statute's requirements. Those requirements were set forth in Medfusion's own Corporate Compliance Plan. The plan charged the CEO, Jeff Vernon, with overseeing Medfusion's compliance with federal law. Moreover, a reasonable jury could have inferred that Jeff Vernon's position as CEO of Medfusion required that he familiarize himself with significant statutes regulating the pharmaceutical industry, including the Anti-Kickback statute. See United States v. Bradley, 644 F.3d 1213, 1243 (11th Cir. 2011) (stating that a reasonable jury could have inferred that defendant, as CEO of pharmaceutical company "had reason to know how Medicaid reimbursed the pharmacies he supplied"), cert. denied, 132 S. Ct. 2375 (2012).

Furthermore, evidence showed that Jeff Vernon knew of Medfusion's payments to HMS/Lori Brill. Jeff Vernon signed the 2008 proposed Medfusion-HMS/Lori Brill contract, which specifically set forth the manner by which

67

Medfusion would compensate HMS/Lori Brill.  Specifically, that contract provided for "finder[']s fee[s]" paid for the referral of patients.

Other evidence also established that Jeff Vernon knew that Medfusion's relationship with HMS/Lori Brill was unlawful.  For example, on August 27, 2008, Jeff Vernon sent an email to Medfusion's attorney, Benefield, informing him that a "Medicaid Inspector was in the office today reviewing [Lori Brill's] son's chart." Jeff Vernon's email stated:

> They have been watching Lori for years.  It is no big deal on our side because we have the appropriate prescriptions.  However, he did ask for how much money Lori has received in compensation for her patients.  I have no problem giving it to him, but I don't want Lori suing us because of it.  Do you see a problem with me giving it to him?

This email allowed a reasonable jury to conclude that Jeff Vernon: (1) knew that Lori Brill was under investigation for federal health care fraud; (2) nevertheless, decided to hire her; and (3) considered refusing to participate in an investigation of Lori Brill's actions.  A reasonable jury could have based a finding of willfulness on these facts.  Although this email came after the June 23, 2008, check to HMS, it supported the inference that Jeff Vernon knew each of these facts well before he sent the email in August 2008.

Additional evidence of willfulness concerning kickbacks to Lori Brill came from Jeff Vernon's 2009 exchange with outside lawyers regarding failed efforts to revise Medfusion's relationship with HMS/Lori Brill so that it came under an Anti-

68

Kickback statute safe harbor provision. While we need not recount that exchange a second time, we note that this evidence was highly probative of Jeff Vernon's willful state of mind, given his leading role in the discussions.

Jeff Vernon also knew about Medfusion's payments to Waters, and knew that such payments were unlawful. Evidence showed that (1) Jeff Vernon hired Waters to be a "sales representative," tasked with providing services to Medfusion clients, and personally negotiated with Waters regarding compensation; (2) before he hired Waters, Jeff Vernon insisted that he receive a list of Waters's hemophiliac clients and how much factor medication each client received each month; (3) Medfusion paid Waters approximately $1,400,000 over three years; (4) this amount reflected a pay rate significantly higher than the rate at which Medfusion paid other "sales representatives"; (5) Medfusion executives did not routinely give Waters specific work assignments or keep track of his activities; (6) contrary to what his contracts required, Waters performed very little work for Medfusion and spent most of his time engaged in non-work activities; and (7) Medfusion received significant profits from filling factor medication prescriptions for Waters's Medicaid clients.

From this evidence, a reasonable jury could have inferred that Jeff Vernon, as Medfusion's CEO, actually hired and compensated Waters for Waters's referring his Medicaid clients to Medfusion. However, Jeff Vernon attempted to

69

conceal this true nature of the Medfusion-Waters relationship by calling Waters a "sales representative." Particularly telling is the fact that Jeff Vernon did not "hire" Waters until after he received a list of Waters's Medicaid clients. A reasonable jury could have inferred that Jeff Vernon wanted to make sure that Waters was able to refer a sufficient number of Medicaid clients to make the potential relationship lucrative. Had Jeff Vernon only wanted Waters to be a sales representative, it would have mattered little whether the clients he recruited were covered by Medicaid or private insurance.

A reasonable jury thus could have concluded that Jeff Vernon gave Waters a sham job title because he was concerned that the Medfusion-Waters relationship was unlawful. Consequently, a reasonable jury could have found that Jeff Vernon acted with a "bad purpose . . . to disobey or disregard the law." See Starks, 157 F.3d at 838 (internal quotation marks omitted).

From this overwhelming evidence, a reasonable jury could have concluded that Jeff Vernon knew that Medfusion was participating in exactly the types of kickback schemes the statute was designed to prevent and thus acted willfully.

Jeff Vernon argues that there was insufficient evidence of willfulness because the evidence established his good faith reliance on the advice of counsel. Essentially, Jeff Vernon argues that no reasonable jury could have rejected his

70

good faith reliance on advice of counsel affirmative defense.  We reject this argument too.

Good faith reliance on counsel's advice can "negate[] the mens rea element of willfulness."  United States v. Petrie, 302 F.3d 1280, 1287 n.6 (11th Cir. 2002).  The elements of this affirmative defense are: "(1)[the defendant] fully disclosed to his attorney all material facts that are relevant to the advice for which he consulted the attorney; and (2) thereafter, he relied in good faith on the advice given by his attorney."  United States v. Hill, 643 F.3d 807, 851 (11th Cir. 2011).  Because good faith reliance is an affirmative defense, a defendant bears the burden of proof on the issue.  See United States v. Eisenstein, 731 F.2d 1540, 1543–44 (11th Cir. 1984).

The district court instructed the jury on this affirmative defense, stating: "[e]vidence that the defendant in good faith followed the advice of counsel would be inconsistent with . . . an unlawful intent."

The ultimate issue of whether a defendant relied in good faith on advice of counsel and therefore did not act willfully is a question of fact to be resolved by the jury.  "Whether the defendant fully disclosed the relevant facts, failed to disclose all relevant facts, or concealed information from his advisor, and relied in good faith on his advisor are matters for the jury—and not the court—to determine, under proper instruction."  United States v. Kottwitz, 614 F.3d 1241, 1272 (11th

71

Cir.), opinion withdrawn and reissued in relevant part, 627 F.3d 1383 (11th Cir. 2010). This Court's role is to view the evidence in the light most favorable to the government, keeping in mind that "credibility choices lie within the province of the jury." United States v. Johnson, 713 F.2d 654, 661 (11th Cir. 1983) (internal quotation marks and alterations omitted).

At trial, Jeff Vernon attempted to establish good faith reliance by pointing to attorney Benefield's testimony that he (Benefield) (1) drafted Medfusion's contracts with Waters and its unsigned contract with HMS/Lori Brill, and (2) believed those contracts to be lawful. The jury considered this evidence and made a factual determination as to whether Jeff Vernon actually relied in good faith on his attorney's advice when he paid unlawful kickbacks. The jury found that Jeff Vernon did not so rely on his attorney's advice, and this determination was not unreasonable. There are specific reasons for why a reasonable jury might have declined to find that Jeff Vernon established this affirmative defense.

First, a reasonable jury could have concluded that Jeff Vernon did not fully disclose all material facts to Benefield. Benefield simply drafted the contracts to provide for Medfusion paying commissions to marketers and deliverers of Medfusion products. He did so at Jeff Vernon's request. However, when Jeff Vernon asked Benefield to draft the proposed Medfusion-HMS/Lori Brill contract, he did not tell Benefield that: (1) Alabama Medicaid had been "watching Lori

72

[Brill] for years"; (2) Medfusion had been paying HMS/Lori Brill huge sums of money in exchange for little work other than the referral of HMS/Lori Brill's preexisting clients; and (3) Jeff Vernon did not expect the contract to change Medfusion's relationship with HMS/Lori Brill.

Likewise, when Jeff Vernon recruited Benefield to draft the Medfusion-Waters contracts, Jeff Vernon did not tell Benefield that: (1) Medfusion did not intend to require Waters to perform any work and did not intend to exercise any oversight over how Waters spent his purported working hours; (2) Medfusion had only hired Waters after Jeff Vernon obtained a list of Waters's preexisting clients; (3) Medfusion was providing Waters with various forms of compensation not set forth in the contract, including a personal vehicle, an interest free loan, and the ability to use a company credit card for apparently unlimited personal uses.

Second, there was evidence that Jeff Vernon did not rely in good faith on any advice that he received from Benefield. Notably, Medfusion began paying kickbacks to HMS/Lori Brill and to Waters well before Jeff Vernon consulted with Benefield. This fact indicated that Jeff Vernon's decision to continue paying kickbacks after consulting with Benefield was not necessarily based on Benefield's advice.

As further evidence that Jeff Vernon did not rely on the legal advice he received from his attorneys, Jeff Vernon continued paying kickbacks after an

73

attorney who specialized in health care regulation, Pool, advised Jeff Vernon that he could not fit Medfusion's relationships with HMS/Lori Brill under an Anti-Kickback statute safe harbor. Not only did Medfusion continue paying kickbacks after receiving Pool's advice, but Jeff Vernon also began to search for a way to put the acknowledged "kickback risk . . . on Lori [Brill]." A reasonable jury could have concluded that because Jeff Vernon did not change his conduct when his attorneys' advice changed, he did not rely on that legal advice in the first place.

Jeff Vernon also argues that, as to counts fourteen through seventeen, the government's evidence failed to establish that Waters was not a bona fide employee, within the meaning of one of the Anti-Kickback statute's safe harbor provisions.

Subsection (b)(3)(B) of the Anti-Kickback statute provides that the illegal remuneration provisions "shall not apply to . . . any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services." 42 U.S.C. § 1320a-7b(b)(3)(B). The accompanying regulations provide that the statutory term "employee" has the definition provided in 26 U.S.C. § 3121(d)(2). 42 C.F.R. § 1001.952(i). That statute provides, in relevant part, that an "employee" is "any individual who, under the usual common law rules applicable in determining the

employer-employee relationship, has the status of an employee."  26 U.S.C.

§ 3121(d)(2).

Whether a worker is an "employee" is based on "the hiring party's right to

control the manner and means [of the work]," which is determined by considering

the following factors:

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323-24, 112 S. Ct. 1344, 1348

(1992) (internal quotation marks omitted).  The district court instructed the jury as

to the bona fide employee defense and listed these factors.

As we explained previously, there was overwhelming evidence that Waters

was not a bona fide employee.  Thus, the jury reasonably rejected this affirmative

defense.

## E.    Cumulative Error

In light of the overwhelming evidence of Jeff Vernon's guilt, and because

none of the alleged errors affected his substantial rights, the alleged cumulative

effect of multiple errors did not deprive Jeff Vernon of his right to a fair trial.

## VI.  NO. 12-13266, UNITED STATES V. BUTCH BRILL

As stated, the jury convicted Butch Brill of the conspiracy offense in count one.  After trial, the district court denied Butch Brill's renewed Rule 29 motion for a judgment of acquittal.  Butch Brill appeals the district court's denial of his Rule 29 motions on the ground that there was insufficient evidence to support his conviction.[12]

### A.    Count One

Count one alleged that Lori Brill, Butch Brill, and Travis Goodwin conspired to "increase the amount of money H.M.S. received as commission payments for filling H.M.S. patients' Factor medication prescriptions," in violation of 18 U.S.C. § 1347(a) and 18 U.S.C. § 1349.

### B.    Evidence Regarding Butch Brill

It is undisputed that, during the relevant period, Butch Brill was Lori Brill's estranged husband.  Butch Brill also worked for his wife's various business ventures, including HMS and the thrift store that Lori Brill operated.  Butch Brill's half-brother, Alex Brill, testified that Butch Brill claimed to be "president" of Lori Brill's "hemophilia business."  Alex Brill also testified that Butch Brill described his HMS duties as delivering factor medication to clients, and taking one client to "water parks and different places."

---

[12]We apply the same standard of review for insufficiency of the evidence as we described in our discussions of the other appeals.

Butch Brill participated in at least some of the overt acts alleged in count one of the indictment. Specifically, the indictment alleged that the conspirators fraudulently enrolled Travis Goodwin in Alabama Medicaid, despite the fact that Goodwin was a Florida resident. At trial, Goodwin testified that he first met Lori Brill in 2004. At that time, he lived in Panama City, Florida. Lori Brill offered to provide health care services to Goodwin, including obtaining medication for him and taking him to doctors' appointments. Goodwin accepted the offer.

Accordingly, Lori Brill began providing these services. Goodwin testified that, at that time, he was insured by Florida Medicaid. Lori Brill arranged for him to see Florida doctors. However, at some point before 2008, Lori Brill began taking Goodwin to see Alabama doctors because Goodwin was dissatisfied with his Florida doctors. In order to maintain full Medicaid coverage, Lori Brill advised Goodwin that he needed to move to Alabama and enroll in Alabama Medicaid.

Goodwin testified that, in 2008, he and his wife moved into a house in Theodore, Alabama owned by Lori Brill. Lori Brill's son, David Skowronski, also lived in this house. According to Goodwin, approximately one week after he arrived in Alabama, Butch Brill "took [him] down to the Medicaid office and . . . got [his insurance] switched over" to Alabama Medicaid.

However, Goodwin did not remain in Theodore, Alabama. After living there "for like about a month straight," he "left and went looking for work in

77

Florida and various places." His wife moved away from Theodore in less than a month. For the following eight months, Goodwin traveled the country performing work for an electrical company. In June 2009, he permanently returned to Florida.

Despite living in places other than Alabama, throughout 2008 and 2009, Goodwin saw Alabama doctors and was insured by Alabama Medicaid. During this period, Butch Brill assisted Goodwin in obtaining factor medication pursuant to his Alabama Medicaid coverage. Specifically, Butch Brill's fax machine was used: (1) on July 13, 2009, to send a request to Medfusion that factor medication be delivered to Goodwin at his "Teakwood Court Southport, Florida" address; (2) on July 28, 2009, to send a similar request to Medfusion; (3) on August 10, 2009, to send factor medication tracking logs to an Alabama doctor; and (4) on August 10, 2009, to send another request for medication and supplies to Medfusion.

There was additional evidence that Butch Brill joined the conspiracy and personally profited from it. The government called as a witness Robert Freeman, a salesman at a Chevrolet dealership. Freeman testified that, in June 2009, Butch Brill came to his dealership interested in buying a 2008 Chevrolet Silverado 1500 pickup truck. However, Freeman was unable to arrange financing for Butch Brill to purchase the truck. Butch Brill left the dealership and told Freeman that "he'd be back to pay cash," indicating that he would obtain the cash from "his son's experimental change in medications." A few weeks later, Butch Brill returned to

78

the dealership, accompanied by Lori Brill to purchase the truck.  Butch Brill paid $2,000 in cash, and Lori Brill gave a cashier's check for $19,950.

Alex Brill, Butch Brill's half-brother, testified about where Butch Brill got this money for the truck.  One night during the summer of 2009, Alex Brill was present during a conversation among Butch Brill, Lori Brill, David Skowronski, and others.  During that conversation, Butch Brill bemoaned his inability to obtain financing to purchase the truck.  Skowronski responded that "he knew a way of getting . . . some money for a truck."  Skowronski suggested that they obtain money by "[o]rdering factor," the medication that Skowronski, a hemophiliac received.  Lori Brill "figured it probably would work."  Butch Brill also "figured it might work."

Dr. Shailesh J. Patel, Skowronski's hematologist, testified that, on June 19, 2009, Lori Brill requested that Dr. Patel change Skowronski's factor medication prescription to a different brand, although Skowronski's existing brand had not caused him any problems.  Patel complied with this request.  The government's evidence indicated that this new brand was more expensive than Skowronski's previous brand.

Approximately two weeks later, Alex Brill observed a shipment of factor medication arrive at Butch Brill's residence.  Thereafter, he saw a similar shipment arrive at Lori Brill's residence.  On July 13, 2009, two checks, one from

79

Medfusion, and one from another pharmacy, were deposited into HMS's bank account. Lori Brill then withdrew $19,950 from HMS's bank account and obtained a cashier's check. Bank records showed that this check was given to Pete Moore Chevrolet. Shortly thereafter, Butch Brill showed Alex Brill the new truck he purchased.

## C.    Elements of the Conspiracy Offense

Butch Brill's conspiracy offense involved committing health care fraud. The health care fraud statute, 18 U.S.C. § 1347, provides that:

> (a) Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—
>
>> (1) to defraud any health care benefit program; or
>>
>> (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,
>
> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined . . . or imprisoned not more than 10 years, or both.

18 U.S.C. § 1347(a). "[I]n a health care fraud case, the defendant must be shown to have known that the claims submitted were, in fact, false." United States v. Medina, 485 F.3d 1291, 1297 (11th Cir. 2007).

For a defendant to be found guilty of conspiracy, the government "must prove beyond a reasonable doubt (1) that a conspiracy existed; (2) that the

defendant knew of it; and (3) that the defendant, with knowledge, voluntarily joined it." United States v. Molina, 443 F.3d 824, 828 (11th Cir. 2006) (internal quotation marks omitted). "Because the crime of conspiracy is predominantly mental in composition, it is frequently necessary to resort to circumstantial evidence to prove its elements." United States v. Toler, 144 F.3d 1423, 1426 (11th Cir. 1998) (internal quotation marks and citation omitted). Moreover, "a defendant can be convicted [of conspiracy] even if his or her participation in the scheme is 'slight' by comparison to the actions of other co-conspirators." Id. at 1428.

As for the existence of the conspiracy element, "[t]he very nature of conspiracy frequently requires that the existence of an agreement be proved by inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." Molina, 443 F.3d at 828 (internal quotation marks omitted).

As for the knowledge element, "the government need not prove that the defendant knew all of the details or participated in every aspect of the conspiracy." United States v. Miranda, 425 F.3d 953, 959 (11th Cir. 2005) (internal quotation marks and alterations omitted). Instead, the government's burden is only to prove "that the defendant knew the essential nature of the conspiracy." Id. (internal quotation marks and alteration omitted). We will affirm a conspiracy conviction "when the circumstances surrounding a person's presence at the scene of

81

conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to him." Molina, 443 F.3d at 828 (internal quotation marks omitted).

As for the voluntary joining element, the government can meet this burden "through proof of surrounding circumstances such as acts committed by the defendant which furthered the purpose of the conspiracy." United States v. Parrado, 911 F.2d 1567, 1570 (11th Cir. 1990) (internal quotation marks omitted).

## D. Evidence that Butch Brill Knowingly and Voluntarily Joined a Conspiracy

In this case, the essence of the healthcare fraud conspiracy charged in count one was to increase Lori Brill's/HMS's commissions from specialty pharmacies, including Medfusion, by fraudulently enabling those pharmacies to obtain Medicaid reimbursements for factor medication. Butch Brill does not dispute that this conspiracy existed and that Lori Brill participated in it. And there was sufficient evidence for a reasonable jury to have found that Butch Brill knew of the conspiracy's purpose and that he voluntarily joined the conspiracy.

As for the evidence that Butch Brill knew of the conspiracy's purpose, Alex Brill testified that Butch Brill was present when Skowronski proposed changing his factor medication prescription in order to fraudulently obtain Medicaid reimbursements for specialty pharmacies, thereby increasing commission payments to HMS/Lori Brill. Additionally, the evidence showed that Butch Brill

82

was very involved in his wife's various hemophiliac-related businesses, even describing himself as "president" at one point.

As for the evidence that Butch Brill knowingly and voluntarily joined the conspiracy, Alex Brill testified that Butch Brill verbally agreed to Skowronski's plan to order factor medication and thus receive money for Butch Brill to purchase a new truck. Moreover, evidence that Butch Brill did purchase a new truck after Skowronski changed his factor medication prescription further supported a conclusion that Butch Brill voluntarily joined the conspiracy. Butch Brill also actively participated in the scheme to register Goodwin in Alabama Medicaid, despite Goodwin being a Florida resident.

In light of the foregoing, a jury reasonably could have concluded that Butch Brill knew of the nature and purpose of a conspiracy involving his estranged wife, Lori Brill. A reasonable jury could also have concluded that Butch Brill voluntarily joined that conspiracy, took actions in furtherance of that conspiracy, and personally profited from that conspiracy's proceeds. Therefore, a reasonable jury could have found beyond a reasonable doubt that Butch Brill was guilty of the conspiracy offense. Butch Brill's appeal based on insufficiency of the evidence lacks merit.

## VII. CONCLUSION

83

In sum, we affirm the district court as to all issues raised in Jeff Vernon's and Butch Brill's appeals. We vacate the district court's grant of a judgment of acquittal to Chris Vernon, and we reverse the alternative award of a new trial. We remand so that the district court can enter judgment on the jury's verdict on counts ten, eleven, and twelve and proceed to the sentencing phase of Chris Vernon's three convictions.

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**